**Kendra SUMMERS, a minor, and Frederick J. Summers, guardian ad litem, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 87–15048.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 16, 1989.

Decided Jan. 18, 1990.

As Amended June 26, 1990.

Arnold I. Berschler, San Francisco, Cal. and Les Scher, Garberville, Cal., for plaintiff-appellant.

Stephen L. Schirle, Asst. U.S. Atty., San Francisco, Cal., for defendant-appellee.

Before GOODWIN, Chief Judge, and PREGERSON and REINHARDT, Circuit Judges.

GOODWIN, Chief Judge:

Kendra Summers appeals a judgment in favor of the United States in her action brought under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671 *et seq.*, to recover for an injury to her foot which occurred at Rodeo Beach, part of a park operated by the National Park Service.

The district court erred in finding her action barred under the discretionary function exception to the FTCA, 28 U.S.C. § 1346(b).

Kendra's injury occurred on August 9, 1984, during a visit to Rodeo Beach, part of the Golden Gate National Recreation Area (GGNRA). Kendra, then four and one-half years old, was walking with her family when they came upon a sign showing a symbol of logs aflame and an arrow pointing to the nearby beach. Upon reaching the beach, Kendra received her parents' permission to take off her shoes and started to walk ahead. She then attempted to balance herself upon a rock which was part of a fire ring, but lost her balance and burned her foot on hot embers within the fire ring.

At the time of Kendra's injury, Rodeo Beach was subject to Park Service and Department of Interior regulations concerning visitor safety. The purpose of the regulations, adopted pursuant to 16 U.S.C. § 1, was to protect visitors from recognized natural and man-made hazards within the park boundaries. The safety program included a manual entitled "Safety and Environmental Health Management Program" which mandated annual inspections for facilities under Interior Department auspices. The manual stated that whenever a safety inspector found unsafe conditions or practices which posed an imminent risk of serious harm or death to the public he or she was required to take steps to abate the danger as soon as possible.

The safety program also included Park Service safety guidelines which the GGNRA implemented under its "Safety Management Program". The GGNRA program included two levels of safety committees: Level 1 committees were assigned for

each operational area of the GGNRA and were responsible for identifying and dealing with hazards within their areas. The Level 2 Committee dealt with problems beyond the competence of the Level 1 committees and with broad policy issues. The Level 2 Committee implemented a park-wide program to identify and address class A hazards (those involving imminent threats to the public) and class B hazards (serious threats to the public) through annual inspections and ranger observations. The GGNRA also formed a park-wide sign committee which reviewed sign proposals and revisions by the field staff and safety manager. When a warning sign was deemed necessary in response to an identified hazard, the sign committee decided on the wording, size, coloring, and placement of the sign. The GGNRA followed the Park Service policy of trying to keep signs to a minimum and generally installed them only where they were necessary to warn the public of an imminent danger.

For some time prior to Kendra's injury, fires were permitted at any location on Rodeo Beach. In response to concerns about alcohol abuse and vandalism by teenagers who built fires on remote areas of the beach, the Park Service changed its policy to confine beach fires to three fire rings located close to and easily observable from the road. After the installation of the fire rings, the rangers noticed that some visitors continued to build fires outside the fire rings and posted the sign warning that fires were permitted only in the fire rings.

Kendra's father, Frederick Summers, filed this action as guardian *ad litem* for Kendra against the United States. During the bench trial the government moved for a directed verdict on the grounds that (1) it was immune under the FTCA's discretionary function exception and (2) Kendra had made no showing of a willful failure to guard or warn. The court granted the government's motion on the first ground, holding that the Park Service's failure to warn of the risk of stepping on hot coals fell within the discretionary function exception.

In accordance with the Supreme Court's decision in *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 535, 108 S.Ct. 1954, 1958, 100 L.Ed.2d 531 (1988), this court utilizes a two-step test to determine whether the FTCA discretionary function exception applies in a given case. *See Kennewick Irrigation District v. United States*, 880 F.2d 1018, 1025 (9th Cir.1989). We must consider first whether the challenged action is a matter of choice for the acting employees: "[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz*, 108 S.Ct. at 1958. If the challenged conduct does involve an element of judgment, the second step is to determine whether that judgment "is of a kind that the discretionary function was designed to shield." *Id.* at 1959. To be shielded the judgment must be grounded in social, economic, or political policy. *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2764, 81 L.Ed.2d 660 (1984).

## A. *PRESCRIPTIVE STATUTE, REGULATION, OR POLICY*

Under the GGNRA safety program as well as the Interior Department guidelines, corrective action by park officials is mandated as soon as a hazard is identified as posing a risk of serious injury to the public. A failure to address an identified danger is inconsistent with regulations and therefore would not be covered under the FTCA's discretionary function exception to liability.

Kendra's first contention is that the district court erred in finding that the risk of serious injury to barefoot visitors from stepping on hot coals left within fire rings had not been identified as a hazard at the time the Park Service decided to install the fire rings on Rodeo Beach. Her claim is based upon Ranger Robert Cheung's admission at trial that the danger of injury to barefoot visitors from beach fire remnants *had* been identified by Park Service officials as a serious hazard prior to the installation of the fire ring sign. Cheung, how-

ever, corrected this testimony later in the trial and stated that the Park Service had no such awareness of the danger from hot coals before it implemented its fire-ring policy. In addition, the chairman of the GGNRA Level 2 Safety Committee, Brian O'Neill, testified that no one on the staff had ever identified the issue of coals on Rodeo Beach as a safety hazard and it was uncontested that prior to Kendra's accident there had been no reports of injury from other beach visitors stepping on hot coals.

In light of Cheung's corrected testimony, along with the other evidence adduced by the Park Service at trial, we find no clear error in the district court's determination that Park Service rangers had not identified the risk of stepping on hot coals as a serious safety hazard prior to Kendra's injury.

## B. *POLICY JUDGMENT*

Having determined that the Park Service's failure to warn of the potential danger of stepping on hot coals did not contravene a prescriptive federal statute, regulation, or policy, we must consider next whether the omission reflects the exercise of judgment grounded in social, economic, or political policy. *See Arizona Maintenance Co. v. United States*, 864 F.2d 1497, 1504 (9th Cir.1989); *Seyler v. United States*, 832 F.2d 120, 123 (9th Cir.1987).

The government claims that Park Service decisions regarding the placement and particulars of park signs fall within the broad discretionary authority delegated to the Park Service by Congress to carry out the Park Service's dual mission of promoting public use of the national parks while preserving them for the enjoyment of future generations. 16 U.S.C. § 1. The government characterizes the Park Service sign policy as an exercise of discretionary judgment balancing the demands of the dual mission: The Service limits park signs to the minimum number and size necessary for adequate warning and guidance to the public in order to conserve the scenery of the parks for future visitors.

There is no evidence, however, that NPS's failure to post warnings of the sort that would have prevented Kendra's injury was the result of a decision reflecting the competing considerations of the Service's sign policy. As we indicated in *Lindgren v. United States*, 665 F.2d 978 (9th Cir. 1982), a governmental failure to warn is not necessarily shielded from suit simply because a discretionary function is in some way involved. On the contrary, we have concluded that "where the challenged governmental activity involves safety considerations under an established policy, rather than the balancing of competing policy considerations, the rationale for the exception falls away and the U.S. will be responsible for the negligence of its employees." *ARA Leisure Services v. United States*, 831 F.2d 193, 195 (9th Cir.1987) (quoting *Aslakson v. United States*, 790 F.2d 688, 693 (8th Cir.1986)).

In *ARA* a tour bus company sued by its passengers when one of its buses went off the road brought an action against the U.S., claiming that the NPS had negligently designed, constructed, and maintained the road. There, as here, NPS policy involved balancing aesthetic and safety considerations, but we nevertheless reversed the district court's grant of summary judgment to the government, finding no clear link between that policy and the Service's failure to maintain the road. *Id.*

Similarly, in *Seyler* we found that the FTCA's discretionary function exception did not encompass the claim of a motorcyclist injured on an Indian reservation that the BIA was negligent in failing to erect speed-limit signs. There was nothing in the record to indicate that the failure to provide signs resulted from a decision grounded in economic, social, or political policy and we doubted that any decision not to provide adequate signs would be "of the nature and quality Congress intended to shield from liability." 832 F.2d at 123; *see also Camozzi v. United States*, 866 F.2d 287 (9th Cir.1989).[1]

---

1. In *Camozzi* this court held that FTCA immunity was not available to shield the U.S. Postal

Service from liability for negligence on the part of contractors it had hired to supervise the con-

Contrary to the government's assertions, our conclusion here creates no conflict with our previous decisions in *Kennewick* and *In re Consolidated Atmospheric Testing* ("*Atmospheric Testing*"), 820 F.2d 982 (9th Cir.1987), *cert. denied*, 485 U.S. 905, 108 S.Ct. 1076, 99 L.Ed.2d 235 (1988). In *Kennewick* an irrigation district sued under the FTCA to recover for personal injuries and property damage resulting from two breaks in the district's main irrigation canal, which had been designed and constructed by the United States. Finding that the governmental decisions made in designing the canal involved " 'the balancing of many technical,' economic, 'and even social considerations,' " we held that the discretionary function exception applied to shield the government from liability arising out of the results of those decisions. 880 F.2d at 1029 (quoting *Boyle v. United Technologies Corp.*, 487 U.S. 500, 511, 108 S.Ct. 2510, 2517–18, 101 L.Ed.2d 442 (1988).

■ However, because there was no such evidence of policy judgment in the government's negligent failure to remove certain unsuitable materials during the *construction* of the canal, we held that liability under the FTCA *did* attach for consequences flowing from the decisions associated with that part of the process. 880 F.2d at 1032. Concluding that *ARA* governed this set of Kennewick claims, we concluded that "[t]he contracting officer's on-site decisions were not 'of the nature and quality that Congress intended to shield from tort liability.' " *Id.* at 1031 (quoting *Varig Airlines*, 467 U.S. at 813, 104 S.Ct. at 2764). Accordingly, we find that the NPS's failure to identify and warn of the danger to barefoot visitors of hot coals on park beaches resembles more a departure from the safety considerations established in Service policies, akin to the situations we confronted in *Seyler, ARA,* and with regard to the construction of the canal in *Kennewick,* than a mistaken judgment in a matter clearly involving choices among political, economic, and social factors, as presented in *Atmospheric Testing, Mitchell,*[2] *Begay,*[3] and most of the other FTCA decisions cited in the government's brief.

*Atmospheric Testing* involved actions brought by military personnel and civilians as a result of their alleged exposure to nuclear radiation during the bombing of Hiroshima and the government's atmospheric testing of nuclear weapons. 820 F.2d 982. Finding that "any decision whether to issue warnings to thousands of test participants of possibly life-threatening dangers and to provide them with appropriate examinations and counseling calls for the exercise of judgment and discretion at high levels of government," we held that the discretionary function exception applied to bar the plaintiffs' claims for damages based upon their exposure. *Id.* at 990. Notwithstanding that conclusion, our opinion also suggested that liability for negligence *may be imposed* where, as here, the governmental decision involved is found not to be grounded in economic, political, or social judgment; i.e., we indicated that fulfillment of a duty to warn is not always a discretionary matter, *See id.* 820 F.2d at 996–97 (distinguishing the facts of *Atmospheric Testing* from Ninth Circuit FTCA cases involving governmental failures to warn river users of hidden obstructions, park users of flash flood risks, and a treat-

---

struction of a postal facility which resulted in harm to two construction workers. Reversing the district court's grant of summary judgment to the government, we found that the negligent failure of the USPS to discover and warn of the openings through which the plaintiffs fell "was not the result of a policy choice by the particular employees or agents involved. It was simply a failure to effectuate policy choices already made." *Id.* at 290. As support, we cited with approval *Madison v. United States*, 679 F.2d 736, 741 (8th Cir.1982), in which the Eighth Circuit held that once the government made the discre-

tionary policy judgment to adopt safety rules and conduct safety inspections, a simple failure to fulfill those obligations did not fall within the discretionary function exception. *Id.* at 292.

**2.** *Mitchell v. United States,* 787 F.2d 466 (9th Cir.1986), *cert. denied,* 484 U.S. 856, 108 S.Ct. 163, 98 L.Ed.2d 118 (1987).

**3.** *Begay v. United States,* 768 F.2d 1059 (9th Cir.1985), *cert. denied,* 485 U.S. 935, 108 S.Ct. 1110, 99 L.Ed.2d 271 (1988).

ing physician of his patient's dangerous propensities).

The district court found that consideration of the dangers presented by beach fire remnants to barefoot visitors played no part in the formulation of the changed Park Service policy on fire rings. We hold that the NPS's failure to recognize and act upon this danger in implementing the new fire-ring policy is not insulated from review under the discretionary function exception of the FTCA.

We express no opinion on whether negligence on the part of the Park Service was proved, nor upon the causal relationship between the conduct of the Park Service, of the parents, and the injury to the child. See Lindgren 665 F.2d at 983. We vacate the judgment and remand for consideration of the negligence and causation questions, free from the erroneous grant of discretionary immunity to the Park Service.

VACATED AND REMANDED.